UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT LANE NELSON, | No. 2:06-cv-02809 JCW |
| Petitioner, | ORDER |
| vs. | |
| D. K. SISTO, Warden, et al., | |
| Respondents. | |

Nelson, a California state prisoner, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He does not challenge his conviction of second degree murder and drug charges, for which he received an aggregate prison term of 22 years to life. Rather, he argues that the Governor of California violated his constitutional rights by reversing the California Board of Parole Hearing's (Board) decision to grant Nelson a parole date.

On August 20, 2009, this case was ordered stayed pending the Court of Appeals for the Ninth Circuit's en banc decision in *Hayward v. Marshall*; that opinion was filed, *see Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc); therefore, the stay is VACATED and Nelson's case may now proceed.

1  I have reviewed the petition, the respondents' answer, the traverse, and the
2  supporting documents. I hold that Nelson is entitled to the relief requested and
3  order the petition granted.

**I.**

The following is a summary of the facts surrounding Nelson's underlying offense, as found in a probation officer's report and recommendation, which was in turn a condensation of reports from the Mendocino County Sheriff's Department:

> On September 23, 1989, Scott Lane Nelson was tending a marijuana garden, owned by him and Jimmy Don Myrick in the Red Mountain area of Northern Mendocino County near Leggett. He was awakened at approximately 6:30 in the morning by rustling in nearby brush and he suspected a marauding bear. He then observed three human forms in one of his nearby patches. He fired a warning shot, and when the men did not stop harvesting marijuana, he fired a second shot. He observed two men run from the scene. He ran to an area where he suspected their vehicle to be parked, but remained out of sight. He heard them call for a third person, who had not returned to the vehicle. After approximately an hour the two men left in their vehicle.
>
> Nelson returned to Fortuna, where he sought out Myrick and explained that their garden had been invaded. He and Myrick decided to return to the garden that evening and harvest the marijuana. They enlisted the help of Richard Perras and Adam Darby. They were driven to the area by Nelson's wife, Mary, and dropped off above the site. Perras and Myrick began harvesting in one garden, while Darby and Nelson harvested in another. Nelson discovered the body of one of the marijuana pirates, later identified as Michael Clawson, who had apparently been shot and killed. After summoning Myrick and Perras, Nelson and Darby covered the body with a tree and brush. The four continued to harvest the marijuana and eventually left the area.
>
> Clawson's two companions, Jerry Wilborn and Charlie Beighley, contacted the Mendocino County Sheriff's Department to report Clawson missing. The men initially stated that they were in the area of Red Mountain on a hunting trip, but later admitted to being there to steal marijuana from a garden that they knew Jimmy Myrick was growing. After entering the area of the gardens, Beighley and Wilborn had become scared and wanted to leave. Clawson stated he wanted to harvest more marijuana and separated from the two other men. They subsequently heard two gun shots in quick succession in their immediate area. They fled on foot, yelling for Clawson to follow. They waited for approximately one hour for him to arrive, before they left. . . .

On November 2, 1989, Sheriff's deputies received information that the victim's mother, Lillian Hineline, had been contacted by Wilborn, who had stated that he had been contacted by someone who stated that Perras had said he had seen a body in that marijuana garden later on the night of the shooting. They contacted Wilborn, who directed them to Richard Perras' residence in Fortuna. Perras confirmed that he, Myrick, Darby, and Nelson had returned to the garden on September 23, 1989, and in the process of harvesting, had discovered the body of Michael Clawson. He heard Nelson yelling, and when he arrived at the location, he heard Nelson say, "I hit him." He later heard Darby state that the victim had been "hit low."

On November 3, 1989, Perras accompanied Sheriff's deputies to the garden location, where Clawson's decomposing body was located.

Detectives were able to locate Adam Darby, who gave further details about the incident, prior to being arrested as an accomplice.

On November 9, 1989, Scott Nelson was arrested by the San Jose Police Department after being contacted at his mother's home in Santa Clara County. During his first interview, Nelson denied shooting the victim. He stated that when he returned to the garden later on September 23, he found Myrick at the location, suffering from a violent attack of flu. Myrick went into town to get a shot, while Nelson returned to the garden to finish the harvesting. Once there, he discovered blood on the hillside and then observed a body near the garden. He returned to Fortuna, where he told Myrick and Perras that there had been problems in the garden and that he had discovered a body. He then described the earlier version of returning to the garden that night with Myrick, Perras, and Darby. After being told that the other witnesses did not support his version, Nelson changed his statement to admitting that he had fired warning shots at three persons in his marijuana garden and that he had chased them off. He did not discover the body until he had returned to the garden later that same day. He stated that he threw the 30-30 rifle he had used in Humboldt Bay, but it was never located.

[Pet. Ex. A at 3-6.]

On March 5, 1991, Nelson was convicted of second degree murder with use of a firearm in violation of California Penal Code sections 187 and 12022.5, and cultivation and transportation of marijuana while armed with a firearm in violation of California Health and Safety Code sections 11358 and 11360 and California Penal Code 12022. [Pet. Ex. C; Ans. Ex. 1; Pet. Ex. J at 1-2.] He received a sentence of five years for the transportation charge with a firearm enhancement;

3

four years for the cultivation charge with a firearm enhancement (to be served concurrently with the five years for the transportation charge); and 17 years to life for the second degree murder charge with the firearm enhancement, to be served consecutive to the drug charges, for a total of 22 years to life. [Pet. Ex. B at 36-39.]

On May 13, 2004, following a hearing, the Board found Nelson was suitable for parole and set a parole date of November 19, 2009; a progress hearing was scheduled for May 2007. [Pet. at 9-11.] On September 22, 2004, however, the grant of parole was reversed by the Governor, who cited the gravity of Nelson's offense as the primary reason for the reversal. [Pet. Ex. O.]

Nelson then filed for a writ of habeas corpus in the Mendocino County Superior Court. [Pet. Ex. P.] That petition was denied on May 26, 2006. [Pet. Ex. R.] He then sought the writ in the California Court of Appeal, First Appellate District, which denied his petition without comment on August 8, 2006. [Pet. Exs. S, T.] The Supreme Court of California denied without comment his petition for review on November 1, 2006. [Pet. Ex. U.] He filed the instant petition in federal court on December 12, 2006; on December 9, 2008, the case was reassigned to me.

## II.

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Nelson asserts that he suffered violations of his rights as guaranteed by the Constitution. His petition was filed after the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), and is therefore governed by the

4

AEDPA. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). Under the AEDPA standards, Nelson's petition may be granted only if he demonstrates that the state court decision denying relief "resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. (internal quotation marks omitted), *citing Doody v. Schriro*, 596 F.3d 620, 634 (9th Cir. 2010) (en banc).

I must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), *quoting* 28 U.S.C. § 2254(d)(1)). To do this, federal courts look to the "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision," *id*., *citing Williams*, 529 U.S. at 412, and consider whether the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," *id*., *quoting* 28 U.S.C. § 2254(d)(1)).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application clause," a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "[A] federal habeas court making the 'unreasonable application' inquiry should ask

5

whether the state court's application of clearly established federal law was *objectively* unreasonable." *Id*. at 409 (emphasis added). Although only Supreme Court law is binding on the states, Ninth Circuit precedent may be persuasive in determining whether a state court decision is objectively unreasonable. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000) ("because of the 1996 AEDPA amendments, [the court] can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue. . . . This does not mean that Ninth Circuit caselaw is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'"). Furthermore, the AEDPA requires that federal courts give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and a federal habeas court is bound by a state's interpretation of its own laws. *See Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

I apply the AEDPA's standards to "the last reasoned decision" by a state court adjudicating a petitioner's claims. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Here, because the California Court of Appeal and the California Supreme Court denied Nelson's petitions without comment, I am to look through to the California Superior Court, which is the last reasoned decision. [Pet. Exs. R, T, U.] *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). The respondents here concede that Nelson's federal habeas petition was filed timely, and that he has exhausted his state judicial remedies as to the Governor's reversal of his 2004 grant of parole. [Ans. at 3.]

6

### III.

Nelson's primary contention is that the Governor's reversal of the Board's approval of parole was not supported by any evidence, and Nelson has therefore been denied due process of law. To make a valid claim that his due process rights have been violated, a petitioner must first have "a liberty or property interest which has been interfered with by the State." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The Ninth Circuit Court of Appeals has recognized that, as a matter of federal law, the relevant Supreme Court decisions do not require "some evidence" to support a denial of parole. *Hayward*, 603 F.3d at 558-59. Thus, for purposes of habeas petitions, "[i]f there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release." *Id*. at 555; *see also id*. at 559 ("[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, in the absence of state law creating an enforceable right to parole"). *Hayward* concluded that "state-created rights may give rise to liberty interests that may be enforced as a matter of federal law." *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010). *Pearson* tells us that "California has created a parole system that independently requires the enforcement of certain procedural and substantive rights, including the right to parole absent 'some evidence' of current dangerousness." *Id*. at 611, *citing Hayward*, 603 F.3d at 561-63. *Pearson* also held that "California law gives rise to a liberty interest on the part of its prisoners covered by its parole system." *Id*.; *see also Cooke*, 606 F.3d at 1213 ("California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state"). Although other states have no duty to conform to the California system, "the California 'some evidence' requirement is enforceable on federal habeas review." *Id*. at 610. Consequently, federal habeas

courts, in reviewing the merits of a federal habeas petition brought by a California prisoner who asserts that the decision to deny him parole was not supported by "some evidence" of his current dangerousness, must examine "whether the California judicial decision approving the [G]overnor's [or Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Id.* at 611, *citing Hayward*, 603 F.3d at 563.

The Court of Appeals for the Ninth Circuit recently explored the California "some evidence" standard:

> Under California law, the paramount consideration for both the Board and the Governor must be whether the inmate currently poses a threat to public safety and thus may not be released on parole, and the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety.

*Cooke*, 606 F.3d at 1214 (internal citations and quotation marks omitted), *citing In re Lawrence*, 190 P.3d 535, 552-54 (Cal. 2008). The California Supreme Court held in *Lawrence* that "[t]he relevant determination for the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate." *Lawrence*, 190 P.3d at 564. In setting forth the standard for federal habeas courts, the Court of Appeals for the Ninth Circuit reiterated this principle, stating that "a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" *Cooke*, 606 F.3d at 1214, *quoting Lawrence*, 190 P.3d at 560. Current dangerousness is the focus of the parole decision, not just the mere presence of a statutory unsuitability factor. *Lawrence*, 190 P.3d. at 552. Moreover, the California Supreme Court has expressly rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current

dangerousness." *Id.* at 554. The Board or the Governor may consider the circumstances of the commitment offense when making a parole decision, but

> the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Id.* at 555; *see also Hayward*, 603 F.3d at 562; *Cooke*, 606 F.3d at 1214.

Here, the California Superior Court identified the "some evidence" standard to be applied. However, it cited California case law that suggests that "[t]he nature of the prisoner's offense, alone, can constitute sufficient basis for denying parole, as long as it exceeds the minimum requirements to sustain a conviction for the offense." [Pet. Ex. R.] *See In re Rosenkrantz*, 59 P.3d 174, 222 (Cal. 2002). That interpretation of *Rosenkrantz* has since been undermined by the California Supreme Court, which held that "to the extent our decision[] in *Rosenkrantz* . . . [has] been read to imply that a particularly egregious commitment offense *always* will provide the requisite modicum of evidence supporting the Board's decision or the Governor's decision, this assumption is . . . inconsistent with the inmate's due process liberty interest in parole." *Lawrence*, 190 P.3d at 539. *Lawrence* clarified that the so-called "minimum elements" test was not the standard; "[r]ather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." *Lawrence*, 190 P.3d at 560.

> When . . . all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the

9

> petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required "modicum of evidence" of unsuitability.

*Id.* at 564.

Thus, the last reasoned state court decision here unreasonably applied the "some evidence" standard, because it analyzed the Governor's decision regarding the aggravated nature of the commitment offense under the minimum elements test, and did not inquire as to whether the Governor articulated some "rational nexus" between the facts of Nelson's offense and his current dangerousness. The fact that the state court unreasonably applied the "some evidence" standard, however, does not end the case; it simply means that I apply de novo review instead of the deference to the state court that the AEDPA normally requires. *Butler v. Curry*, 528 F.3d 624, 641 (9th Cir. 2008). This federal court's power to issue a writ of habeas corpus to Nelson depends on his actually being "in custody in violation of the Constitution or laws of the United States." *Id.* (internal quotation marks and citation omitted). Thus, Nelson is only entitled to habeas corpus relief if his due process rights were violated by a lack of "some evidence" supporting the Governor's decision. I therefore turn to the Governor's stated reasons for denying parole. *Cooke*, 606 F.3d at 1214.

## IV.

In his decision reversing the grant of parole, the Governor focused heavily on the nature and circumstances of Nelson's crime. [Pet. Ex. O.] The Governor acknowledged that Nelson has had no disciplinary problems in prison; has received his GED and obtained vocational training in several areas; has held a highly skilled job at the prison; has participated in "an array of self-help and therapy, including

10

Narcotics Anonymous, Anger Management, and Substance Abuse Recovery Program"; tutors other inmates; has maintained contact with family; and has "realistic plans" for where he will live and work upon his release on parole. However, the Governor emphasized the "especially atrocious" nature of Nelson's crime, observing that he used deadly force to protect a criminal enterprise (his marijuana crop) and opined that the act "was beyond reckless, it was calculated." The Governor expressed skepticism that Nelson did not know he had killed someone right away, given that the other two men whom he had shot at were calling for a third person for about an hour. The Governor also said that, regardless of whether he knew he had killed someone at that time, he demonstrated "a complete lack of empathy and an intent to conceal and evade responsibility" later when he found the victim's body and simply covered it with brush and returned to harvesting marijuana. He then left the body for more than a month before it was discovered, and disposed of the murder weapon by throwing it in Humboldt Bay. The Governor opined that Nelson's conduct following the murder "was that of a pitiless killer." The Governor then went on to observe that, in the intervening years, Nelson or his former counsel had presented varying accounts of the crime: (1) in 2003, the attorney who represented Nelson at trial submitted a letter to the Board stating that Nelson had believed the thieves were armed and he was in danger, and fired to protect himself; (2) Nelson told a probation officer "years ago" that his conviction for second-degree murder was inappropriate because the killing was accidental and he had not intended to kill the victim; (3) Nelson told the Board at his 2004 hearing that he fired his first shot "over [the individual's] head in a safe distance" and his second shot "into the creek bed"; and (4) a 2002 mental health evaluation concluded that Nelson "acknowledges he was

11

the cause of his crime, although he continues to maintain that it was a terrible accident." [Pet. Ex. O.]

The California Supreme Court has made it clear that the circumstances of Nelson's offense, no matter how troubling, are not sufficient in and of themselves to deny parole; "mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness," does not provide some evidence of unsuitability. *Lawrence*, 190 P.3d at 564. But the Governor did not provide any such nexus; in fact, the Governor expressly relied on the commitment offense *alone*, stating that "[b]ased on the gravity alone of the second-degree murder committed by Mr. Nelson, I believe his release from prison at this time would pose an unreasonable risk to society." [Pet. Ex. O at 2.] This appears to be the precise situation contemplated in *Lawrence*, where "all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger." 190 P.3d at 564.

The *only* part of the Governor's decision that might possibly be read as an attempt to link Nelson's offense to his current dangerousness is the Governor's recitation of certain statements that Nelson or others have made in the intervening years that might, perhaps, indicate that Nelson has not taken full responsibility for his crimes, but the Governor did not "articulat[e]" that nexus; rather, he simply reiterates the statements, and a reader must speculate whether the Governor may have viewed those statements as some evidence of Nelson's lack of insight into or failure to take responsibility for his crimes.

1    The first statement cited by the Governor was not made by Nelson. The
2 Governor is apparently referring to a letter submitted to the Board in 2003 by the
3 attorney who represented Nelson at his 1991 trial. The letter encouraged the Board
4 to "review Mr. Nelson's testimony from his trial. You will see that he felt armed
5 thieves were endangering not only his property but his life. He fired to protect
6 himself and unfortunately a man was killed." [Pet. Ex. J at 47.] This letter only
7 recites defense arguments made at the time of the 1991 trial; there is no indication
8 that Nelson tried to justify the murder in that way in 2003, and there is no
9 indication that Nelson has had any significant contact with his former attorney in
10 the intervening years or asked him to characterize the crime in that manner. This
11 statement cannot be imputed to Nelson and it is not helpful in determining whether
12 Nelson has taken responsibility for his crime.

13    The Governor next pointed out that Nelson told a probation officer "years
14 ago" that his conviction for second-degree murder was inappropriate because the
15 killing was accidental and he had not intended to kill the victim. This is an
16 apparent reference to a statement Nelson made to a probation officer on *March 20,*
17 *1991*, immediately after his conviction. [Pet. Ex. A at 7.] This statement can have
18 no bearing on Nelson's dangerousness at the time of the Governor's decision in
19 September 2004.

20    The Governor also points out that Nelson told the Board at his 2004 hearing
21 that he fired his first shot "over [the individual's] head in a safe distance" and his
22 second shot "into the creek bed." This statement, too, cannot reasonably be read as
23 "some evidence" that Nelson has failed to take responsibility for or gain insight
24 into his crimes. Taken in context, Nelson's full statement to the Board was as
25 follows:
26

13

> Inmate Nelson: At first . . . I thought he was a black bear, because I had bad problems with a black bear in that area at that time. But when I realized there was a human being, I shot over his head in a safe distance. *I thought that the distance I shot was safe.*
> Presiding Commissioner Perez: You shot over, you aimed over his head; is that what you're saying?
> Inmate Nelson: Yes.
> Presiding Commissioner Perez: What did you eventually hit him?
> Inmate Nelson: I didn't hit a person then, no.
> Presiding Commissioner Perez: Okay.
> Inmate Nelson: That was the first shot. . . . The second shot I shot, I shot down into the creek bed. . . . At that time, there was, that was into the brush. There was no, I didn't see no human beings. I didn't know whether was anybody down there.
> Presiding Commissioner Perez: Okay.
> Inmate Nelson: *So it was fully my fault for shooting in the brush without knowing*.

[Pet. Ex. J at 21-22 (emphasis added).] The remarks cited by the Governor, in their full context, do not provide any evidence that Nelson was trying to disclaim responsibility for the murder. He clarified that he "thought" that his first shot was aimed so as not to hit a person, but fully acknowledged that it was "my fault" for shooting without knowing where the people were – in other words, for shooting recklessly, without regard for the safety of the people he knew to be near him. He went on, soon after the above-quoted exchange, to express how he felt about the murder:

> I'm horrified that this had happened. Somebody lost their life for me wanting to grow marijuana. . . . Even though what I was doing in my mind at that time, I thought it was right. Now, I know that it wasn't right. . . . And I was just trying to do a quick way to make money. . . . I'm trying to find out what drew me to this and to keep me away from doing this. I do not want to do this again. It is the greed, and I can't really explain why I did this other than greed. . . . In my mind, I would have to say, I knew deep down it was wrong [then], but I didn't care. I was a fool like I said. All I cared about was money. And at this time, money is not a issue. Doing something illegal for money is wrong, and it got me to this and made Mike Clausen [sic] lose his whole life. His whole family has lost Mike. So I've hurt more than just myself. I've hurt people who bought my weed. I've hurt people that dealt with my weed. We don't know what kind of crimes that happened. I've done more things that we don't even know about from my doings . . .. By just me growing the weed . . ..

14

> Attorney Montgomery: You're indicating you understand that there are repercussions that are felt at far distances, correct?
> Inmate Nelson: Beyond what I can explain.
> Attorney Montgomery: Beyond the obvious. . . .
> Inmate Nelson: . . . I'm learning more and more each day. Every time I do a Bible study, every time I go to church I understand the right from wrong, and every situation comes up, making the right decision. There's always a right decision, and there's always a bad decision. And now I know that I have to pick the right decision. I have to work on that, and I have. . . . I'm just about ready to cry right now. Every time we start talking about the case, I try to not remember what's going on, but it is a good thing for me to go back and remember what's going on because this is a reminder that this is something that I've done. And it didn't hurt me, it hurt his family, his friends, the whole everything down. I was a bad piece of the chain of what was going on. And it hurts me that I was part of it, and somebody's life can actually come of my doings. And at that time I didn't, there wasn't a thought, just go out there and do what you got to do. Do your work. But when someone ends up dying of your (indiscernible) your actions, I mean, I don't know how to explain or tell you how I feel, but I know every time we get into it, it touch pretty deep inside here.

[Pet. Ex. J. at 23-29.] This is similar to *Lawrence*, in which the Governor, in reversing a grant of parole,

> suggested that petitioner continued to pose a threat to public safety because she was not remorseful and because she continued to attempt to justify the victim's murder. As support, the Governor pointed to quotations excerpted from the proceedings at petitioner's 2002 and 2005 Board hearings, such as petitioner's observation at the latter hearing that " 'I always viewed [the woman she killed] as the obstacle in my fantasy romance. That she was the one that was keeping me from having what I wanted. So in my mind, it was natural for me to confront her as though she would disappear. . . .' [Petitioner also] said that she saw Mrs. Williams as her 'problem.'"

190 P.3d at 561. The California Supreme Court held there was not "some evidence" supporting the Governor's reasoning, observing that

> it is evident from the full context of petitioner's statements that she merely was explaining her state of mind at the time of the homicide, not justifying it. To the contrary, these and like statements were made in the course of condemning her own behavior on that occasion and expressing deep remorse for what she had done and why she had done it. Additionally, as the Court of Appeal recognized and as the record amply demonstrates, petitioner consistently, repeatedly, and

15

articulately has expressed deep remorse for her crime as reflected in a decade's worth of psychological assessments and transcripts of suitability hearings that were before the Board. Accordingly, the Governor's conclusion that petitioner showed insufficient remorse is not supported by any evidence; rather, it is clearly contradicted by abundant evidence in the record.

*Id.* (internal quotation marks, citations and footnotes omitted). The same situation is present in the transcript of Nelson's hearing; taken in context, his remarks to the Board about shooting his first shot "in a safe distance" and his second shot "into the creek bed" cannot reasonably be read as an attempt to avoid responsibility for his actions. He took full responsibility for his actions, and reflected on the impact of his criminal activities and the factors that led him to commit his crimes in the first place. Indeed, in rendering its decision, the Board stated, "It is also the opinion of this Panel that you show significant signs of remorse in that I'd like to note for the record that it is our opinion that you are very sincere in the emotion that you are showing right now. Furthermore, we feel that you've indicated you understand the nature and the magnitude of the offense and that you accept responsibility for the criminal behavior." [Pet. Ex. J at 94.]

The last statement cited by the Governor is a 2002 mental health evaluation, which observed that Nelson "acknowledges he was the cause of his crime, although he continues to maintain that it was a terrible accident." [Pet. Ex. I at 3.] However, the very same evaluation stated that he "expressed remorse and empathy for the victim," that "in prison his level of dangerousness has been low," and that, "[u]pon release, if he follows his current plans to stay away from the local marijuana-growing activities, his estimated dangerousness should continue to be low." [Pet. Ex. I at 3-4.] It is difficult to see how this one statement in the 2002 mental health evaluation can provide the requisite "nexus" between Nelson's commitment offense and his current dangerousness, where Nelson has repeatedly

1 acknowledged responsibility for the murder.  This is not a case like *In re Shaputis*,
2 in which the California Supreme Court held that the Governor's decision was
3 supported by some evidence of current dangerousness where, "although petitioner
4 has stated that his conduct was 'wrong,' and feels some remorse for the crime, he
5 has failed to gain insight or understanding into either his violent conduct or his
6 commission of the commitment offense." 190 P.3d 573, 584 (Cal. 2008).  In that
7 case, "[e]vidence concerning the nature of the weapon, the location of ammunition
8 found at the crime scene, and petitioner's statement that he had a 'little fight' with
9 his wife support the view that he killed his wife intentionally, but as the record also
10 demonstrates, petitioner *still* claims the shooting was an *accident*." *Id*.  The court
11 thought this claim, together with "petitioner's history of domestic abuse and recent
12 psychological reports reflecting that his character remains unchanged and that he is
13 unable to gain insight into his antisocial behavior despite years of therapy and
14 rehabilitative 'programming,'" all provide "some evidence" of current
15 dangerousness. *Id*. at 584-85.  Here, the Board found that Nelson not only feels
16 remorse, but has repeatedly acknowledged responsibility for the crime and gained
17 understanding of why he committed it.

## V.

19 I hold that the Governor's reversal of the Board's grant of parole was not
20 supported by "some evidence" as required by California law.  The Governor
21 expressly relied on the commitment offense alone, and failed to point to any
22 evidence that reasonably suggested the gravity of Nelson's commitment offense
23 remained probative of his current dangerousness in 2004, almost 15 years after the
24 offense.

25 I therefore order that:

26 1. Nelson's petition for a writ of habeas corpus is granted, and

2. Judgment be entered as follows: The Board shall find Nelson suitable for parole at a hearing to be held within 35 days of the order adopting this decision, unless new evidence of his conduct in prison or change in mental status subsequent to the 2004 parole hearing is introduced and is sufficient to support a finding that Nelson currently poses an unreasonable risk of danger to society if released on parole. In the absence of any such new evidence showing Nelson's current dangerousness, the Board shall calculate a prison term and release date for Nelson in accordance with California law. Further, if the release date already has passed, respondents shall, within 14 days of the Board's hearing, release Nelson from custody. With respect to his presumptive period of parole, Nelson is to be credited for any time that has lapsed since the release date calculated by the Board in 2004. *See Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1026 (9th Cir. 2010) (holding that the district court's remedy was proper where, upon granting the writ, the district court ordered the Board to set a parole date for the petitioner within thirty days); *see also Fellows v. Hartley*, 2010 WL 2902514 at *8 (E.D. Cal.).

DATED: November 1, 2010            /s/ Clifford Wallace
                                                     J. Clifford Wallace
                                                     United States Circuit Judge